# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

PATRICIA A. TAYLOR,

       **Plaintiff,**

                                    **Case No. 2:16-cv-1118**
    **v.**                              **Judge George C. Smith**
                                      **Magistrate Judge Elizabeth P. Deavers**

NANCY A. BERRYHILL,

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Patricia A. Taylor, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12) ("SOE"), the Commissioner's Memorandum in Opposition (ECF No. 15) ("Opposition"), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I.  BACKGROUND

Plaintiff protectively filed her application for benefits on June 19, 2013, alleging that she has been disabled since July 3, 2008. (R. at 204–12.) Plaintiff's application was denied initially and upon reconsideration. (R. at 98–128.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 102–04.) Administrative Law Judge Christopher S. Tindale ("ALJ") held a video hearing on October 20, 2015, at which Plaintiff, who was represented by

counsel, appeared and testified. (R. at 40–77.) A vocational expert also appeared and testified at the hearing. (R. at 67–76.) On November 30, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 19–31.) On September 25, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY[1]

### A. Plaintiff's Testimony

Plaintiff testified at the October 20, 2015, administrative hearing that she is forty-seven years old, married, and lives with her husband. (R. at 44.) She is five feet, five inches tall and weighs 172 pounds, which has gone up and down in the last two to three years. (R. at 45.)

Plaintiff knows how to read and write. (R. at 45.) She wears glasses to read and sometimes has difficulty spelling words she does not know. (*Id*.)

Plaintiff last worked at a restaurant in 2012 where she was on her feet all day, washing dishes and peeling potatoes. (R. at 46–47.) She would also lift boxes of potatoes that weighed thirty to forty pounds, possibly up to fifty pounds. (R. at 49–50.) She was fired from this full-time job because she could not lift the potatoes and had trouble keeping up with the dishes. (R. at 47–48.) She testified that another reason she was fired was because the restaurant was "mad" when she asked for her paycheck. (R. at 48.)

In 2007 and 2008, Plaintiff worked full-time as a custodian at a school. (R. at 48.) She emptied trashcans, cleaned chalkboards and desks, and did a lot of lifting. (*Id*.) Some of the trash cans in the art room were very heavy because they contained cement. (R. at 50.) She was

---

[1] The Undersigned limits the analysis of the evidence and the administrative decision to the issues raised in the Statement of Errors.

on her feet all day.  (R. at 51.)  She got injured on the job in 2008, sustaining a skull fracture.  (R. at 48–50.)

Plaintiff testified that she has been having "really bad headaches."  (R. at 51.)  Over the last two to three years, she experiences headaches twice weekly.  (R. at 51–52.)  These headaches last approximately one to two hours, sometimes longer, sometimes shorter.  (R. at 52–53.)  According to Plaintiff, dizziness is a symptom of the headaches.  (R. at 52.)  She is afraid she will fall and uses a cane for balance.  (*Id.*)  She also cries when she gets the headaches because "[t]here's nothing I can do about it.  It just keeps going."  (*Id.*)  On a scale of one to ten with ten being the most severe pain, Plaintiff rated her pain level from headaches at around a seven or an eight.  (R. at 56.)

When she gets headaches, Plaintiff has to curl up in a ball, lie down on a bed, and put ice on her neck and head.  (R. at 52.)  While she takes ibuprofen, sometimes it works and sometimes it does not.  (*Id.*)  She also takes Topamax, Gabopentin, Tramadol.  (R. at 53.)  She takes Trazodone to prevent pain so that she can sleep at night.  (R. at 53, 61.)  At one point she received injection treatment for her headaches, but it has been a while since she received them.  (R. at 53.)  She testified that her pain and medicine doctor, Michael Shramowiat, M.D., sought approval for additional injections, but "Workman's Comp denied the injections."  (*Id.*)

Plaintiff testified that her medications give her a dry mouth and made it difficult for her to talk at the hearing.  (R. at 61.)  She is not aware of any other side effects from the medications.  (*Id.*)

Plaintiff also has neck pain.  (R. at 51, 53–54.)  Her neck feels tight and she has gone to therapy, but it has not loosened up at all.  (R. at 54.)  The neck pain is always there and goes

down her left arm on a daily basis with a stabbing or tingling feeling and then it goes away. (*Id.*) As a result of this arm pain, she sometimes drops things. (R. at 54–55.)

Plaintiff testified that she has constant lower back pain every day, which feels like someone stabbing her. (R. at 55–56.) Assuming that her medications are working, Plaintiff still rated her pain level at about a seven, with ten being the most severe pain. (R. at 56.) She has difficulty climbing the stairs in her house because her back and neck hurt when she does so. (R. at 44–45.)

Plaintiff appeared at the hearing with a cane and explained that Kimberly Spencer, a nurse practitioner, prescribed the cane. (R. at 56.) Plaintiff started using the cane when she had cellulitis and for balance. (*Id.*) Plaintiff does not use the cane all of the time; only when she knows she will be on her feet for a long period of time. (R. at 57.) In a typical week, she probably uses the cane two to three times a week. (*Id.*) She does not use it around the house because she usually holds on to things there. (*Id.*) Sometimes she uses it in public, such as when she goes out shopping. (*Id.*)

Plaintiff explained that balance has been a problem for her since she was injured. (*Id.*) She has fallen in the last two or three years. (*Id.*) She cannot remember the last time she fell, but she hurt her shoulder and right arm. (R. at 57–58.) Plaintiff continues to have difficulties with that shoulder. (R. at 58.)

She also has chronic obstructive pulmonary disease (COPD) and has difficulty breathing. (*Id.*) Plaintiff testified that this condition is "hard on" her because it is hard to breathe when walking and she sleeps with oxygen at night. (*Id.*) She has used oxygen at night for about three years and does not use it at all during the day time. (R. at 59.) She takes Spiriva in the morning and carries an emergency inhaler with her. (R. at 58.) Plaintiff also has an inhaler that she uses

4

on a regular schedule throughout the day as well as a rescue inhaler that she uses only when she needs it.  (R. at 58–59.)  She explained that she uses the rescue inhaler when she starts hyperventilating or gets anxiety and cannot breathe.  (R. at 59.)

Plaintiff testified that she has some urinary incontinence problems.  (R. at 59–60.)  She wears Depends, because when she stands up, it is out of her control and "just pours[.]"  (R. at 60.)  Plaintiff explained that this condition is aggravating and embarrassing and sometimes makes her not want to go out in public.  (*Id*.)

Plaintiff experiences emotional ups and downs.  (R. at 61.)  During the day, she has trouble with her mind racing.  (R. at 61–62.)  Plaintiff cries a couple of times a week.  (R. at 62.)  She is receiving mental health treatment from a counselor whom she sees twice a month.  (R. at 64.)

She is able to get along with people and has one good friend that she usually visits.  (R. at 62–63.)

With medication, Plaintiff is able to sleep six or seven hours a night.  (R. at 62.)

Plaintiff has difficulties with her memory.  (R. at 63.)  If she does not write something down, she will forget.  (R. at 63–64.)

In the course of a typical day, Plaintiff will get up and have coffee with her husband before he leaves for work.  (R. at 64–65.)  She will sometimes try and do dishes and then sit down.  (R. at 65.)  She tries to sweep in the kitchen, but has to sit down because she becomes aggravated and cannot finish it all.  (*Id*.)  When she tries to do other rooms, she will work for about fifteen minutes and then have to take a break, alternating like this until she is finished.  (*Id*.)  Her lower back and neck pain requires her to sit down and take breaks, which last approximately twenty to thirty minutes.  (*Id*.)  During the breaks, she will put an ice pack on her

lower back. (R. at 65–66.) A couple of days a week, she visits with her girlfriend who lives a couple of miles away. (R. at 66.) Plaintiff will go to her friend's house and visit with her. (*Id*.)

Plaintiff denies drinking alcohol or using street drugs. (*Id*.) She has been smoking since the age of thirteen and still smokes half a pack a day. (*Id*.) She has unsuccessfully tried to quit several times. (R. at 67.)

**B.      Vocational Expert Testimony**

"Ms. Trent" testified as a vocational expert ("VE") at the October 20, 2015, administrative hearing. (R. at 78–89.) The VE testified that Plaintiff's past jobs include cleaner, a medium exertion, unskilled job, and kitchen helper, a medium exertion, unskilled job. (R. at 69.) The ALJ proposed a hypothetical that presumed an individual with Plaintiff's age, education,[2] and work experience, capable of performing light work with the following limitations:

> the standing and walking would be limited to four hour in an eight-hour day, sitting would be six hours in an eight-hour day, could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch, crawl. Must avoid concentrated exposure to extreme cold, extreme heat, humidity, and pulmonary irritants, such as fumes, odors, dust, gases and poor ventilation. Must avoid even moderate exposure to hazards and can have no exposure to unprotected heights. Work would be limited to simple, routine, repetitive tasks, and a work environment free of production rate or pace work. Can only have occasional contact with the public, coworkers or ·supervisors, must work -- or work must be in a low stress environment defined as having only occasional changes in the work setting and only occasional decision-making required. Also be limited to frequent handling and fingering and feeling with the left upper extremity, and frequent reaching with the right upper extremity.

(R. at 69 –70.) The VE testified that the hypothetical individual could not perform Plaintiff's past work. (R. at 70.) Assuming "those occasional functions and limitations[,]" the VE testified that the hypothetical individual could perform work as a mail clerk and collator operator, both of

_____

[2] Plaintiff has at least a high school education. (R. at 29.)

which were light, unskilled positions that were available nationally and regionally. (R. at 70–71.)

Assuming the additional limitation of use of a handheld assistive device for prolonged ambulation, with bilateral upper extremity could be used to lift and carry up to the exertional limit, the VE testified that use of an assistive walking device would eliminate light jobs. (R. at 71.) If the exertional level was changed from light to sedentary, the VE testified that the hypothetical individual could perform work as an inspector, sorter, and bench assembler, which were sedentary, unskilled positions that were available nationally and regionally. (*Id.*)

Assuming the additional limitation of being off task 20% of the work day, the VE testified that such limitation would be work preclusive. (R. at 71–72.) The VE testified that any level of being off task beyond 10% is work preclusive. (R. at 72.)

Plaintiff's counsel asked the VE whether there was any competitive work available, assuming Plaintiff was expected to miss two days of work per month on an unpredictable, ongoing basis because of migraine headaches, pain and other symptoms. (R. at 72–73.) The VE testified that such absenteeism would be work preclusive. (R. at 73.) When asked what absences were tolerated in the unskilled work settings, the VE testified two to three times per month over a couple of months. (*Id.*)

Plaintiff's counsel then asked the VE whether there is any competitive work setting in the unskilled level, presuming the same limitations at the sedentary level that were previously given as well as the additional limitation that the Plaintiff would need at least two or three breaks during the work day (in addition to the regularly schedule lunch and breaks) and restroom breaks when needed because of pain and psychiatric symptoms. (*Id.*) The VE testified that there would not be any competitive work that would accommodate two to three additional unscheduled

breaks.  (*Id.*)

Finally, Plaintiff's counsel asked the VE to assume the same hypothetical with the additional limitation that Plaintiff would require, for a third of a normal workday, direct supervision and redirection in order to stay on task and complete tasks.  (R. at 73–74.)  The VE testified that such a limitation would be work preclusive.  (R. at 74.)

### III.    MEDICAL RECORDS

#### A.    Camden-Clark Memorial Hospital

On July 3, 2008, Plaintiff fell and hit her head.  (R. at 710.)  A CT of her head taken the same day revealed a small, vague area of increased density in the right frontal lobe, possibly representing hemorrhagic contusion, as well as partial opacification of the left mastoid air cells with fluid / blood or density in the left middle ear.  (R. 745.)  The CT also revealed coupled tiny gas bubbles adjacent to the left occipital bone, one of which is intracranial, suggesting pneumocephalus.  (*Id.*)  These findings raised concern for skullbase fracture even though no definite fractures were detected.  (*Id.*)

A follow-up CT of Plaintiff's head taken on July 11, 2008, revealed extensive edema in the right frontal lobe, but previous parenchymal hemorrhage had resolved.  (R. at 760.)  The CT further revealed continued opacification of the left mastoid air cells.  (*Id.*)

#### B.    Michael Shramowiat, M.D.

On April 21, 2009, Michael Shramowiat, M.D. examined Plaintiff and administered bilateral greater occipital nerve block with Methylprednisolone (steroid injections).  (R. at 516–17.)

Plaintiff presented to Dr. Shramowiat on August 31, 2011, complaining of neck pain and headaches.  (R. at 514.)  He noted that Plaintiff experiences dizziness and that she gets headaches

three times a week.  (*Id.*)  He reported that "[g]reater occipital nerve blocks were requested but denied."  (*Id.*)

Plaintiff continued to follow up with Dr. Shramowiat on October 26, 2011.  (R. at 513.) She reported severe headaches.  (*Id.*)  He reported that she will need greater occipital nerve block bilaterally.  (*Id.*)

On December 28, 2011, Plaintiff presented to Dr. Shramowiat, complaining of continued neck pain and headaches.  (R. at 512.)  He performed greater occipital nerve blocks with Methylprednisolone, which he noted were "medically necessary for the symptoms and medical condition the patient has on today's visit."  (*Id.*)

On February 22, 2012, Dr. Shramowiat examined Plaintiff who reported that her headaches had improved.  (R. at 511.)  He reported that doctors who performed an independent medical examination had recommended greater occipital nerve blocks and that treatment had now been approved.  (*Id.*)  Dr. Shramowiat performed that procedure during the visit.  (*Id.*)

Plaintiff presented for examination by Dr. Shramowiat on March 21, 2012.  (R. at 510.) She reported improvement in her headaches.  (*Id.*)  He noted that she did well with the greater occipital nerve blocks.  (*Id.*)

On May 16, 2012, Dr. Shramowiat reported that her headaches had improved.  (R. at 509.)

Upon examination on June 7, 2012, Dr. Shramowiat noted that Plaintiff complained of headaches.  (R. at 508.)  He stated that she could return to work light duty with no lifting over 20 pounds even though Plaintiff had difficulty performing some daily life activities.  (*Id.*)

Plaintiff reported moderate to severe headaches during an examination on August 2, 2012. (R. at 507.) Dr. Shramowiat noted pain at the greater occipital nerve bilaterally. (*Id*.) He performed greater occipital nerve blocks, noting it was medically necessary. (*Id*.)

Dr. Shramowiat saw Plaintiff on October 2, 2012, as a follow up for her workers' compensation claim. (R. at 505–06.) She reported that she had lost her job since her last office visit. (R. at 505.) She reported daily headaches described as moderate to severe. (*Id*.) Dr. Shramowiat noted bilateral occipital nerve tenderness. (*Id*.) Dr. Shramowiat requested bilateral occipital nerve blocks and a neurological evaluation due to constant headaches and forgetfulness. (*Id*.)

Plaintiff did not report any headaches upon examinations on October 29, 2012, November 21, 2012, December 18, 2012, February 14, 2013, April 11, 2013, and June 11, 2013. (R. at 498–504.) During the examination in June 2013, Dr. Shramowiat noted that Plaintiff "presented with copies of IME [independent medical examination] that was performed on 04/09/13 per Dr. Stanko. It is Dr. Stanko's opinion that the claimant has reached maximum medical improvement and that conditions have become permanent." (R. at 455, 498.)

Plaintiff presented with a headache upon examination on August 6, 2013. (R. at 496.) She complained of chronic neck pain that radiates between her shoulders and up the back of her head, causing a daily headache. (*Id*.) Dr. Shramowiat noted that she did well with previous occipital nerve blocks. (*Id*.)

Upon examination on October 2, 2013, Plaintiff complained of intermittent headaches. (R. at 495.) She reported that she had previously become dizzy and fell. (*Id*.) Dr. Shramowiat reported that she had previously done well with occipital nerve blocks. (*Id*.)

Upon examination on March 20, 2014, Plaintiff complained of daily headaches, reporting that she is dizzy on a daily basis, which sometimes makes her fall. (R. at 672.) Dr. Shramowiat continued her Tramadol and noted that she will be given bilateral occipital nerve blocks. (R. at 672–73.)

On July 15, 2014 and September 10, 2014, Plaintiff followed up with Dr. Shramowiat for her occupational injury under workers' compensation. (R. at 669–70.) Plaintiff complained of continued intermittent or daily headaches. (*Id.*) Plaintiff reported that the headaches last approximately one hour and sometimes longer. (R. at 670.) Dr. Shramowiat noted that Plaintiff continued on Norco, Tramadol, and Neurontin "with fairly good symptom decrease and no side effects, though she does not feel these are as effective as they used to be." (*Id.*) He also noted that bilateral greater occipital nerve blocks have been denied. (R. at 669.)

Upon examination on March 2, 2015, Plaintiff reported intermittent headaches and memory difficulties. (R. at 666.) Dr. Shramowiat continued her on Tramadol. (*Id.*)

On March 25, 2015, Dr. Shramowiat noted that Plaintiff complained of intermittent headaches and some memory loss. (R. at 1033.) She also reported that she takes Tramadol on a regular basis with adequate symptom decrease and no side effects. (*Id.*)

Upon examination on May 21, 2015, Dr. Shramowiat noted that Plaintiff complained of intermittent headaches and she continued on Tramadol. (*Id.*)

On July 20, 2015, and September 16, 2015, Plaintiff reported continued intermittent headaches. (R. at 1028, 1030.) She reported that she takes Tramadol as prescribed with adequate symptom decrease and no side effects. (*Id.*)

**C.     Hopewell Health Centers**

On December 5, 2013, Plaintiff reported that an increased dose of Topamax helped her headaches. (R. at 585.) Plaintiff was assessed with headaches and migraines. (R. at 586.) Plaintiff's Topamax was refilled. (R. at 587.)

Upon examination on February 24, 2014, Plaintiff complained of chronic headaches. (R. at 596–97.) Her Topamax was refilled. (R. at 597.)

## D.     Kenneth J. Manges, Ph.D.

On July 18, 2015, Kenneth J. Manges, an Ohio-licensed forensic psychologist and vocational specialist, issued an opinion regarding Plaintiff's condition in connection with her workers' compensation claim. (R. at 1118–27.) Dr. Manges interviewed Plaintiff, reviewed the medical records, and administered a Million Clinical Multiaxial Inventory-III to measure Plaintiff's psychological functioning. (*Id.*) In his evaluation, Dr. Manges noted her symptoms the DSM-IV criteria for depressive disorder 311. (R. at 1123–25.) In response to a series of examination questions, Dr. Manges responded to three specific questions as follows:

> 2. If specific medical evidence is cited on the C-86 motion and/or the C9 request as support for the requested condition(s), please list it below. Review the information submitted, and indicate whether the documents substantiate the requested condition(s).
>
> **Answer: The C-86 motion indicates a mood disorder due to edema (cerebral) with major depressive like episode based on a report by Dr. Richetta. This report was not provided in the documents reviewed by this examiner so it cannot be commented on.**

(R. at 1125 (emphasis in original).)

> 3. Does the medical evidence in the file, your evaluation, and the subjective and/or objective findings support the diagnosis of the requested condition(s) according to the DSM IV criteria?
>
> **Answer: Yes. The claimant asserts having difficulty with feelings of depression along with crying spells on a daily basis, loss of self-esteem, and feelings of hopelessness consistent with a major depressive like episode.**

(R. at 1125–26 (emphasis in original).)

> 10. Does the medical support the request for the additional allowance of mood disorder cerebral with major depressive like episode? If you feel that temporary total compensation is also supported for this condition beginning 03/11/2015.
>
> **Answer:  Yes. The medical information excepting the report by Dr. Richetta which was not part of the exam packet does support the claimant's mood disorder. The claimant also presents herself as being temporary totally disabled as of 03/11/2015.**

(R. at 1126–27 (emphasis in original).)

## E.    State Agency Review

On August 19, 2013, Gary S. Sarver, Ph.D., a psychological consultative examiner, evaluated Plaintiff to determine her current level of psychological functioning.  (R. at 473–79.) Dr. Sarver diagnosed her with adjustment disorder with mixed anxiety and depressed mood as well as a personality disorder not otherwise specified.  (R. at 478.)  He opined that she should have "no particular difficulty in understanding, remembering, or carrying out simple job instructions[,]" but that she would likely experience more difficulties as job instructions become increasingly complex.  (R. at 479.)  Dr. Sarver further opined that her "affective instability may occasionally attenuate her capacity to perform multistep tasks" and that it is "likely that she will eventually encounter contentious relationships with supervisors and coworkers in the work setting."  (*Id*.)  He also opined that her "personality disorder suggests that she is likely to have difficulty organizing, structuring, and working towards goals."  (*Id*.)  According to Dr. Sarver, Plaintiff "is likely to have intermittent difficulty adaptively managing normative work pressures."  (*Id*.)

William S. Froilan, Ph.D., a psychological consultative examiner, evaluated Plaintiff on March 11, 2015.  (R. at 656–62.)  Dr. Froilan diagnosed her with a mood disorder due to edema

(cerebral) with major depressive-like episode. (R. at 661–62.) Dr. Froilan went on to opine as

follows:

> In my opinion, the depressive symptoms subsequent to the workplace injury indicates Ms. Taylor suffers Mood Disorder Due to Edema (cerebral) With Major Depressive-Like Episode (DSM-IV: 293.83) as a direct and proximate consequence of the allowed conditions as listed on page one of this report. As she currently is unable to sustain employment, Ms. Taylor should be considered temporarily and totally disabled. Recommendations for treatment are individual psychotherapy (with a therapist cognizant of and comfortable with the limitations of someone brain-damaged) and referral for psychiatric evaluation to determine a possible medication regimen for addressing her reported symptoms.

(R. at 662.)

## IV. ADMINISTRATIVE DECISION

On November 30, 2015, the ALJ issued his decision. (R. at 19–31.) At step one of the

sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since June 19, 2013, the alleged onset date. (R. at 21.) At step two, the ALJ

concluded that Plaintiff had the following severe impairments: disorders of the spine; chronic

obstructive pulmonary disease/asthma; residuals from a head fracture; obesity; mood disorder;

---

[3]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

personality disorder; and anxiety disorder.  (*Id*.)  The ALJ determined that Plaintiff's

hypertension, hyperlipidemia, gastro esophageal reflux disease, tinea pedia, allergic rhinitis,

incontinence, cellulitis, and prediabetes are not severe impairments.  (*Id*.)

At step three of the sequential process, the ALJ concluded that that Plaintiff did not have

an impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22–24.)  At step

four, the ALJ assessed Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; and must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, or poor ventilation.  The claimant must avoid even moderate exposure to hazards and must avoid all exposure to unprotected heights.  The claimant is limited to frequent reaching with the light upper extremity.  The claimant is limited to frequent handling, fingering, feeling with left upper extremity.  The claimant is limited to simple, routine, repetitive tasks in a work environment that is free of production rate or pace work.  The claimant is limited to only occasional contact with the public, co-workers, or supervisors.  The claimant's work must be in a low stress environment defined as having only occasional changes in the work setting and only occasional decision making required.  The claimant is limited to jobs that can be performed while using a hand held assistive device for prolonged ambulation and the contralateral upper extremity can be used to lift and carry up to the exertional limits.

(R. at 24.)   In reaching this determination, the ALJ assigned "some weight" to Dr. Sarver's

opinion, but only "little weight" to Dr. Froilhan's opinion.  (R. at 28.)  The ALJ also found

Plaintiff's allegations of limitations to be not fully credible.  (R. at 26.)

Relying on the VE's testimony, the ALJ determined that Plaintiff can perform jobs that

exist in significant numbers in the national economy.  (R. at 29–30.)  He therefore concluded that

Plaintiff was not disabled under the Social Security Act.  (R. at 30.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

# VI.    ANALYSIS

Plaintiff advances two contentions of error.  First, Plaintiff contends that the ALJ

committed reversible error in failing to find her headaches to be a "severe" impairment within

the meaning of the regulations.  (ECF No. 12 at 8–10.)  Second, she contends that the ALJ erred

in failing to address all medical opinions in the record.  (*Id*. at 10–12.)

## A.    Headaches as Severe Impairment

If no signs or laboratory findings substantiate the existence of an impairment, it is

appropriate to terminate the disability analysis at step two.  *See* SSR 96-4p, 1996 WL 374187, at

*2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to

substantiate the existence of a medically determinable physical or mental impairment, the

individual must be found not disabled at step 2 of the sequential evaluation process set out in 20

CFR 404.1520 and 416.920 . . . .").  Furthermore, in the Sixth Circuit, "the step two severity

regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a *de minimis*

hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.

1988).

Where the ALJ determines that a claimant has a severe impairment at step two of the

analysis, "the question of whether the ALJ characterized any other alleged impairment as severe

or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec*., 73 F. App'x 801, 803,

(6th Cir. 2003).  Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects

of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's]

residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the

claimant's argument that the ALJ erred by finding that a number of her impairments were not

severe where the ALJ determined that claimant had at least one severe impairment and

considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, the ALJ determined that Plaintiff had the following severe impairments: disorders of the spine; chronic obstructive pulmonary disease/asthma; residuals from a head fracture; obesity; mood disorder; personality disorder; and anxiety disorder. (R. at 21.) While he did not specifically consider her headaches to be a severe or a non-severe impairment, the ALJ continued with the sequential evaluation and considered them in his RFC determination, which was proper. *See Pompa*, 73 F. App'x at 803; *Marziarz*, 837 F.2d at 244. The ALJ explained the limiting effects of Plaintiff's headaches as follows:

> As for the claimant's medications and other symptoms, Dr. Hopewell noted on December 5, 2013, that Topamax was helping the claimant's headaches, Neurontin was helping with her neuropathy, and HCTZ was helping with her swelling. The claimant also reported feeling a lot better. Similarly, on January 24, 2014, the claimant reported doing much better (Exhibit 14F). Also, Dr. Michael Shramowiat noted on March 25, 2015, that the claimant takes Tramadol as prescribed with adequate symptom decrease and no side effects (Exhibits 16F and 26F). The claimant's treatment notes also reflected on July 20, 2015, and September 16, 2015, that she had adequate symptoms decrease with Tramadol and she denied side effects (Exhibit 26F).
>
> The claimant's treatment has also been conservative and routine in nature, consisting mainly of medications and nerve blocks (Exhibits 6F; 10F). However, she has not required frequent hospitalizations, emergency treatment, or surgical intervention.

(R. at 26–27.)

Plaintiff nevertheless argues that the evidence reflects that she had chronic headaches and dizziness in February, July, and September 2014, which "dispute the ALJ's claim that she was better as of the December 2013 visit." (ECF No. 12 at 10.) In advancing this argument, however, Plaintiff disregards the ALJ's consideration of Dr. Shramowiat's note in March 2015 that that she was taking Tramadol as directed and experienced a decrease in symptoms and no

side effects from the medication. (R. at 26.) Similarly, Plaintiff ignores that the ALJ reasonably considered Dr. Shramowiat's more recent treatment notes in July and September 2015 that she had adequate symptom decrease with Tramadol and denied any side effects. (*Id.*)

Plaintiff further complains that the ALJ noted that Plaintiff's treatment was conservative, consisting primarily of medications and nerve blocks, arguing that "the record shows that this is what was recommended by her physician." (ECF No. 12 at 9.) However, the ALJ reasonably considered this information. As the Commissioner points out, this evidence demonstrates that Plaintiff's headaches were not so severe that her physicians determined that nothing more than conservative treatment was necessary. *See*, *e.g.*, *Masters v. Comm'r of Soc. Sec.*, 707 F. App'x 374, 380 (6th Cir. 2017) (finding that, *inter alia*, the ALJ properly considered multiple factors, including conservative treatment, when assessing the medical evidence); *Lester v. Comm'r of Soc. Sec.*, 596 F. App'x 387, 389 (6th Cir. 2015) (considering conservative treatment when weighing medical source statements).

Moreover, earlier in his RFC discussion, the ALJ considered Plaintiff's credibility, finding that the evidence did not support that Plaintiff showed most of the signs associated with debilitating disorders. (R. at 26.) Notably, Plaintiff does not challenge the ALJ's credibility determination, which is entitled to great deference. *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Nevertheless, the RFC adequately accounts for a claimed symptom of Plaintiff's headaches. Specifically, Plaintiff complained that dizziness is a symptom of the headaches, stating that she used a cane for balance. (R. at 52.) The RFC limits Plaintiff to, *inter alia*, "jobs that can be performed while using a hand held assistive device for prolonged ambulation[.]" (R. at 24.) Plaintiff is responsible for showing how her headaches affect her functioning. 20 C.F.R. §

416.912(a). Plaintiff, however, has not pointed out how this RFC in inadequate. Similarly, Plaintiff has not cited to any additional work-related limitations that should have been included or to any medical source opinions demonstrating that her headaches create additional limitations inconsistent with the articulated RFC. The ALJ's consideration of Plaintiff's headaches is supported by substantial evidence and did not result in reversible error. *See, e.g.*, *Debelak v. Berryhill*, No. 1:16-cv-02782, 2017 WL 6372571, at *11 (N.D. Ohio Nov. 14, 2017) (rejecting argument that the ALJ erred at step two and recommending that the Commissioner's decision be affirmed where, *inter alia*, the plaintiff did not specifically address how the RFC was inadequate, did not point to any particular work related limitations that should have been included, and identified no limitations from any medical source opinions that were inconsistent with the articulated RFC), *adopted by* 2017 WL 6344627, at *1 (N.D. Ohio Dec. 12, 2017); *Vidot v. Colvin*, No. 1:14-cv-1343, 2015 WL 3824360, at *2 (N.D. Ohio June 18, 2015) (finding that ALJ did not err at step two where, *inter alia*, the plaintiff did not point to any specific work related limitation and where the ALJ considered her migraines in the RFC analysis "[a]lthough admittedly the analysis surrounding plaintiff's migraines is minimal"). Finally, even if there is substantial evidence that would have supported an opposite conclusion, a count must defer to the ALJ's decision if it is supported by substantial evidence. *Blakley*, 581 F.3d at 406.

For these reasons, it is **RECOMMENDED** that Plaintiff first contention of error be **OVERRULED**.

B. **The ALJ's Treatment of Medical Opinions**

Plaintiff complains that while the ALJ considered the opinions of state agency psychological consultants, William Froilhan, Ph.D., and Gary S. Sarver, Ph.D., he did not reference Dr. Manges' report. (ECF No. 12 at 10–12.) Plaintiff acknowledges that the ALJ is

not required to discuss every piece of evidence, but argues that he should have discussed Dr. Manges' opinion, which she contends is probative of her emotional and cognitive functioning, judgment and insight, daily activities, and mental status.  (*Id*. at 11–12.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. §§ 404.1527(c), 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

Here, the ALJ's failure to address Dr. Manges' opinion does not warrant remand.  Other than an opinion that Plaintiff was "temporary totally disabled," Dr. Manges did not express a medical opinion about Plaintiff's psychological capabilities or limitations.  (R. at 1118–27.)  As set forth above, Dr. Manges evaluated Plaintiff for purposes of her workers compensation claim and his opinion that she was temporarily totally disabled, "is a state law standard applicable to workers compensation matters and clearly not a medical opinion within the meaning of § 404.1527(c)."  *Gossett v. Comm'r of Soc. Sec*., No. 2:13-cv-0106, 2013 WL 6632056, at *6 (S.D. Ohio Dec. 17, 2013), *adopted by* 2014 WL 49818 (S.D. Ohio Jan. 7, 2014); *see also Chapin v. Astrue*, No. 2:11-cv-0069, 2012 WL 701882, at *8 (S.D. Ohio Mar. 1, 2012), *adopted* 2012 WL 2195056 (S.D. Ohio June 15, 2012) ("The Court notes that disability standards under the Social Security Act differ significantly from those applicable under various state's Workers' Compensation laws.") (citations omitted).  Because there was no opinion regarding psychological limitations or disability for social security purposes from Dr. Manges, there was "nothing for the ALJ to consider."  *Gossett*, 2013 WL 6632056, at *6.  Moreover, Dr. Manges'

opinion that Plaintiff is totally disabled is a matter reserved to the Commissioner and not entitled to any weight. SSR 96–5p, 1996 WL 374183, at *5 (1996) ("Medical sources often offer opinions about whether an individual . . . is 'disabled' or 'unable to work[.]' . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner."); 20 C.F.R. § 416.927(d)(1) (providing that a medical source's opinion that a claimant is disabled and unable to work is a matter "reserved to the Commissioner" that is not entitled to "any special significance"); *see also Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to Dr. Dhar's opinion because her conclusion that Cosma is totally disabled is a determination reserved to the Commissioner[.]").

For these reasons, it is **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**

Date: February 20, 2018                                              s/ *Elizabeth A. Preston Deavers*
                                                         ELIZABETH A. PRESTON DEAVERS
                                                         UNITED STATES MAGISTRATE JUDGE